**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    No. CR 13-3367 RB

JESSIE JESUS MARQUEZ,

      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Defendant's Objection to the Pre-Sentence Report, filed on April 17, 2016 (Doc. 494), and Addendum to Joint Motion to Continue Trial and Attendant Deadlines, filed on April 28, 2016 (Doc. 497). The Court held a Sentencing Hearing on February 15, 2017. (*See* Doc. 527.)

Defendant makes two objections to the Pre-Sentence Report (PSR) and argues that his sentence was calculated in error. The primary issues are: (1) whether the jury's verdict included a finding that the overall scope of the conspiracy involved more than 500 grams of methamphetamine, and alternatively, whether the Government's evidence was sufficient to prove that Defendant was involved in a conspiracy involving more than 500 grams of methamphetamine; and (2) whether Defendant is entitled to a minor role adjustment. (*See* Docs. 494, 497.) Having considered the submissions of counsel and relevant law, the Court will **OVERRULE** Defendant's objections. The sentence imposed at the February 15, 2017 Sentencing Hearing—121 months as to Counts 1 and 13, and 48 months as to Counts 23, 30, 36, and 41—stands. (*See* Doc. 527; *see also* Sentencing Hr'g Tr.[1] at 28:3–9.)

---

[1] All citations to the Sentencing Hearing Transcript are to the court reporter's unofficial transcript. Page numbers are subject to change in the official version of the transcript.

## I.    Procedural and Factual Background

### A.    The Indictment

Mr. Marquez (Defendant), one of 18 defendants charged in a 43-count Indictment, was charged with seven counts: conspiracy to distribute 500 grams and more of a mixture and substance containing methamphetamine, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and in violation of 21 U.S.C. § 846 (Count 1); two counts that he knowingly and intentionally possessed with intent to distribute a controlled substance, a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Counts 13 and 29); and four counts that he knowingly and intentionally used a communication facility, a telephone, to further the commission of a drug trafficking crime, namely, conspiracy to possess with intent to distribute a controlled substance, contrary to 21 U.S.C. § 846 and in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2 (Counts 23, 30, 36, and 41). (*See* Doc. 1; *see also* Doc. 484 at 14–16.)

### B.    The Government's Case-in-Chief

During its case-in-chief, the Government introduced the following evidence at Defendant's trial on January 25–27, 2016. (*See* Docs. 491–93.)

On the basis of information the Drug Enforcement Administration (DEA) obtained from an informant, the DEA began investigating Mr. Robert Christner (Christner) on suspicion of distributing methamphetamine in the Alamogordo, New Mexico area. (*See* Doc. 491 at 33:25–34:2.) After conducting several controlled purchases of methamphetamine from Christner, the DEA learned Christner was able to obtain pound quantities of methamphetamine. (*See id.* at 34:3–5, 35:13–21.) The DEA obtained authorization for a wire-tap investigation on March 14, 2013. (*Id.* at 36:23–37:4.) The DEA ultimately obtained three separate authorizations to intercept seven

different phone lines belonging to Christner and other individuals who the DEA had reason to believe were involved in obtaining and distributing methamphetamine. (*See id.* at 37:5–21.)

One of these seven phone lines—Target Telephone 7—was attributed to Defendant.[2] (*See id.* at 56:3–5, 88:20–89:2.) During the trial, the Government presented evidence of numerous phone calls and text messages between Defendant and Christner. Based on these communications, Agent Billhymer—the case agent for the investigation—determined that Christner was the supplier for Defendant, and Defendant was dealing methamphetamine under Christner. (*Id.* at 93:6–13.)

During a March 16, 2013 telephone call, Christner inquired about methamphetamine Defendant had received from Christner. (*Id.* at 63:12–65:15.) Christner was concerned about the quality of the methamphetamine and told Defendant, "If it's good, let it go out. If it's not, bring it back. We can do a refund . . . ." (*Id.*) The two men also talked about whether it was "fire," which, Agent Billhymer testified that in her experience was in reference to the quality of the methamphetamine. (*Id.* at 64:21–65:9.) Finally, Christner told Defendant he planned to see his "uncle" on Monday, which is the term Christner used to mean his source of supply. (*Id.* at 65:14–23.)

On March 18, 2013, the agents intercepted a call between Christner and a second person, who Agent Billhymer determined was probably Christner's source of supply. (*Id.* at 66:6–67:1.) During this call, the agents learned that Christner "planned to meet someone named Michelle in Willcox that following Wednesday," March 20, 2013. (*Id.* at 67:1–5.) On March 19, 2013, agents intercepted a phone call between Defendant and Christner, in which Christner said "whatever you

---

[2] While Defendant was identified as being the person who used one of the seven phone numbers, Defendant was not the individual who actually subscribed to that phone number. (*See, e.g.*, Doc. 492 at 22:22–24.) Agent Billhymer testified that in her experience as a DEA agent in this "type of investigation[], it is rare for someone . . . to have their own name on the subscriber for the telephone" in order "to avoid law enforcement detection" or because it is part of a family plan subscription. (*Id.* at 27:2–22.)

3

got would come in handy." (*Id.* at 67:16–68:2.) Agent Billhymer testified that from this phone call, she believed Christner was asking Defendant to contribute money so that Christner could buy a quantity of methamphetamine on Wednesday from his source of supply. (*Id.* at 67:23–68:8, 93:9–13.) Later that day, agents intercepted a telephone call that led them to believe the two set up a meeting to exchange money as agreed on earlier. (*Id.* at 69:19–70:15.) No agents were able to conduct surveillance of this meeting, however. (*Id.* at 70:16–71:6.)

On the morning of March 20, 2013, agents intercepted a telephone call between Christner and the person believed to be the courier he was meeting that day. (*Id.* at 73:11–18.) During this call, the two confirmed the meeting time, the courier said that she had "two" with her, and they discussed "that other stuff, the stuff [he] had to undo . . . ." (*Id.* at 73:22–74:4.) Agent Billhymer's understanding about the meaning of "the stuff [he] had to undo" referred to complaints Christner had been getting from his dealers, who had been having a hard time selling the previous shipment of methamphetamine. (*Id.* at 74:3–17.) Later that morning, agents intercepted a call between Christner and his source of supply, who told Christner that he was sending "three full ones, two oranges and eight grapes" with a courier, Ms. Michelle Casillas; Christner responded that he had "16" with him. (*Id.* at 76: 2– 14.) Agent Billhymer testified that the agents understood "three full ones, two oranges, eight grapes" to mean a little over three pounds of methamphetamine, and "16" meant money. (*Id.* at 76:14–21.)

Based on information obtained from the investigation, DEA agents had a description for the vehicle the courier would be driving. (*Id.* at 75:16–23.) The DEA communicated this information to officers in Arizona, and Trooper Keith Duckett with the Arizona Highway Patrol located Ms. Casillas's vehicle on the morning of March 20, 2013. (*Id.* at 76:22–25, 97:17–98:2.) Officer Duckett stopped Ms. Casillas, performed a search of her vehicle pursuant to the traffic

stop, and recovered approximately three pounds (1,401 grams) of methamphetamine from the vehicle. (*Id.* at 78:7–16, 79:24–80:17, 99:10–100:24, 119:18–120:1.)

There were also DEA agents following Christner and two other individuals out of Las Cruces on the morning of March 20. (*Id.* at 77:3–7.) The agents lost Christner for a time due to his erratic driving, but they eventually performed a traffic stop on Christner's vehicle on his way back into Las Cruces. (*Id.* at 77:8–78:1.) Officers searched Christner pursuant to the traffic stop and found a little more than $16,000 in cash on his person. (*Id.* at 78:2–6.)

The Government presented evidence that Christner began looking for a new source of supply after the DEA interrupted his source of supply from Arizona. (*Id.* at 127:14–128:10, 130:11–16.) Agent Billhymer testified that she intercepted a telephone call between Christner and Defendant on April 12, 2013, in which the two men were talking about "obtaining a 'big one' or large quantity of methamphetamine." (*Id.* at 127:14–129:12.) Through a series of telephone calls and text messages intercepted on April 12 through 17, 2013, Agent Billhymer believed that Defendant was planning on traveling with Christner and introducing him to a new potential source of supply. (*Id.* at 131:2–136:9.) Interceptions of a text message and telephone call on April 18, 2013, led Agent Billhymer to believe the two men had successfully met with the new source of supply on April 17. (*Id.* at 136:10–138:4.) Agents heard Christner tell another of his distributors that he had obtained some methamphetamine from the new potential source of supply on April 17 and was planning to meet with the new source on April 18 "to make it a relationship." (*Id.* at 138:5–139:23.)

Through text messages and calls intercepted on April 18, 2013, agents gathered evidence that Christner was planning a second trip on April 18 without Defendant, but Defendant was communicating with certain persons and sharing those conversations with Christner, "kind of

giving him instructions on what to do based on the previous meets with these individuals." (*Id.* at 136:10–138:4, 140:11–141:10, 141:19–143:2.) After this meeting, Christner told another of his distributors that the new source of supply "he was now working with [was] basically kind of nickel-and-diming him, only providing certain quantities of meth. He was accustomed to pound quantities and . . . he wasn't able to get pound quantities initially with these individuals . . . ." (*Id.* at 143:18–145:6.)

Christner and Defendant communicated again on April 19, 2013: Agent Billhymer testified that Defendant told Christner he was "talking to the middleman" and it was clear that Defendant was negotiating larger quantities of methamphetamine. (*Id.* at 145:12–146:12.) Specifically, Defendant talked about "two" and "three," which the agents believed meant pounds of methamphetamine. (*Id.* at 146:12–14.) Defendant and Christner also discussed "eight, eight to five, to nine[,]" which the agents believed meant $8,000, $8,500, and $9,000—a price per pound of methamphetamine that was consistent with the price Christner had been paying to his previous source of supply. (*Id.* at 146:19–147:8.) Later on April 19, Defendant and Christner spoke on the telephone again, and agents heard Defendant and Christner talk about meeting the new source to pick up "just four, 32[,]" which agents believed meant four ounces of methamphetamine for $3,200. (Doc. 492 at 5:24–6:17.)

On the evening of April 19, 2013, agents intercepted a telephone call between Christner and another individual. (*Id.* at 8:20–21.) Christner told the individual that "his ride was there to pick him up and" Christner wanted to meet with this individual "at the Pic Quik on Telshor." (*Id.* at 8:21–23.) Agents conducted surveillance of this meeting at the Pic Quik[3] and saw Christner in

---

[3] Agent John Duffy observed Christner and Defendant at a Village Inn parking lot before they drove to the meeting at the Pic Quik; Agent Duffy was also able to record the license plate number of the car Defendant was driving. (Doc. 492 at 35:17–38:4, 40:18–41:24.)

a gold Mitsubishi that they later discovered was registered to Defendant's mother. (*Id.* at 9:24–10:5, 13:20–14:13.) Based on the agents' research, Agent Conan Becknell, who also conducted surveillance on April 19 and at one point walked within two feet of Defendant, positively identified Defendant from his driver's license photo. (*Id.* at 14:12–15:11, 56:11–61:2.) After Defendant and Christner left Pic Quik, they drove out of Las Cruces and exited at the Anthony exit. (*Id.* at 10:9–11:12.) The agents eventually lost track of the vehicle, but later that evening, agents intercepted two telephone calls between Christner and two of his distributors, in which Christner confirmed that he picked up "groceries" (a code word for methamphetamine) and that communications with the new source of supply had gone well. (*Id.* at 13:4–19, 17:4–19, 19:11–21.) At this point in the investigation, Agent Billhymer understood "[t]hat Mr. Christner had found a new source of supply that he was comfortable with, that they worked out negotiating the prices and the quantities, and . . . he was letting his people know that they were back in business . . . ." (*Id.* at 19:22–20:7.) The agents also "heard Mr. Christner mention 'a lot of groceries' or 'being fat on Tuesday[,]'" which they interpreted to mean he "would be able to obtain pound quantities of methamphetamine from this unknown source." (*Id.* at 20:11–18.) The DEA agents were unable to confirm this belief, because Christner changed phones, and the DEA was unable to intercept his calls and text messages for a period of time. (*Id.* at 20:19–21:1.)

In June 2013, agents intercepted a number of calls between Defendant and Christner, which caused them to believe that the new source of supply Defendant helped arrange did not produce a long-term relationship, and Defendant had returned to a traditional distributor relationship with Christner. (*See id.* at 73:15–74:5, 76:21–77:9, 78:12–80:8, 81:10–23, 83:13–89:23.)

C.        The Jury Instructions and the Jury's Verdict

At the close of the Government's case on Wednesday, January 27, 2016, Defendant chose to rest without calling any witnesses. (*See* Doc. 493 at 13:20–24.) With the testimony concluded, the Court held a jury instructions conference with Mr. Harrison, attorney for Defendant, and Ms. Davenport, attorney for the United States. (*Id.* at 13:25–14:3.) Instruction Number 13 set out the elements of Count 1, the conspiracy charge. (*See* Doc. 484 at 17–18.) In relevant part, the instruction read: "To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt: . . . *Fifth*: the overall scope of the conspiracy involved more than 500 grams of a mixture and substance containing methamphetamine." (*Id.* at 17.) The related jury verdict form question number one read:

> 1) We, the Jury, find the Defendant, JESSIE JESUS MARQUEZ, (Guilty or Not Guilty) of Conspiracy as charged in Count 1 of the Indictment.
>
> If you found the Defendant guilty, please answer the following question.
> The overall scope of the conspiracy involved more than 500 grams of a mixture and substance containing methamphetamine.
> Yes _____    No _____

(Doc. 487 at 1.) Neither party objected to Instruction Number 13 or to the form of the jury verdict on Count 1 during the Court's jury instructions conference or when the parties received the final copies. (*See* Doc. 493 at 13:25–20:25 (discussing the parties' objections to the stock jury instructions and the jury verdict, and Mr. Harrison noting that his only objections were related to the possession counts); *see also id.* at 22:15–23:25 (asking the parties if there were any objections to the final, clean copy of the jury instructions, and Mr. Harrison pointing out that the word "methamphetamine" was never used on the wires, while the word "coke" was used).

While the jury was deliberating, the foreperson sent a note to the Court regarding question number one on the verdict form. The question read:

> In deciding guilty/not guilty on Count 1, we read & understand that the amount of 500 g or more is a criteria embedded in the Indictment in Count 1 (as part and parcel of the charge), but on the verdict sheet there is a YES/NO checkoff with Count 1. Please clarify. Can we agree on 'guilty' for Count 1 and <u>not</u> agree that it involved more than 500 grams? Or do we have to mark "YES" to the grams in order to find guilty on this charge?

(Doc. 485 at 5.) The Court asked counsel if they "intend[ed] the verdict form to have a step-down . . . ." (Doc. 493 at 86:13–15.) Ms. Davenport replied that they had not intended a step-down, but intended the jury to make a specific finding regarding quantity. (*Id.* at 86:17–19.) She thought that if the jury did not "answer the specific question about the amount, under *Apprendi*, then" the Defendant could not be sentenced to the mandatory minimums. (*Id.* at 92:15–23.)

The Court noted that because the amount was embedded as an element in Count 1, the jury's verdict could be internally inconsistent if they found Defendant guilty of the conspiracy count, but then found that it was not more than 500 grams. (*Id.* at 87:2–7.) Mr. Harrison agreed and said if the jury does not "find the 500 grams, I think they have to find him not guilty." (*Id.* at 87:10–12.) Mr. Harrison noted that the jury "framed it correctly, that the 500 grams is an element of the offense so they must find 500 grams to find him guilty. And that is an element in the jury instruction." (*Id.* at 88:23–89:2.)

Ms. Davenport argued that the jury should answer both questions in order for the Government to meet its burden on Count 1. (*Id.* at 90:10–22.) The Court said that Ms. Davenport's suggestion would "rework[] the instructions post-facto" and suggested the response to the jury be that if it unanimously finds the Defendant guilty of Count 1, the jury would not need to respond to the yes/no question. (*Id.* at 89:5–10.) Counsel for both parties agreed, and the Court sent the jury a note that read: "If you agree, unanimously, as to guilt on Count I, you may disregard the 'yes/no' question that follows. 500 gms. is an element of the offense." (Doc. 485 at 7.)

The jury found Defendant guilty on six of the seven counts—including the conspiracy count—on January 27, 2016. (Doc. 493 at 95:8–97:1.) The jury left the yes/no drop-down question blank. (*Id.* at 95:22–23.).

### D.    Defendant's Sentence

The United States Probation Office prepared a PSR in anticipation of Defendant's sentencing hearing.[4] The PSR recommended that Defendant be held responsible for a conspiracy to distribute from 500 to 1,500 grams of a mixture containing methamphetamine, with no role adjustment warranted. (PSR at 38.) Based on U.S. Sentencing Guidelines Manual § 2D1.1, which provides the guideline for 21 U.S.C. § 846 offenses, an offense involving at least 500 grams but less than 1.5 kilograms of methamphetamine has a base offense level of 30. (PSR at 39.) The PSR recommended no adjustments. (*See id.*) The offense level of 30, together with Defendant's criminal history category of III, yielded an advisory sentencing range of 121 to 151 months as to Counts 1 and 13, and 48 months as to Counts 23, 30, 36, and 41, pursuant to U.S. Sentencing Guidelines Manual § 5G1.1(a). (PSR at 51.)

Defendant objected to the PSR on two grounds: Defendant argued (1) the jury did not find he was responsible for 500 grams or more of methamphetamine, and alternatively, the Government did not provide evidence sufficient to tie him to the Arizona transaction; and (2) he is entitled to a minor role adjustment. (*See* Docs. 494, 497.)

The Court held a sentencing hearing on February 15, 2017. (*See* Doc. 527.) The Court invited argument relevant to Defendant's two objections to the PSR. Defendant argued that the jury found Defendant guilty of conspiracy but did not agree on quantity. (*See* Sentencing Hr'g Tr.

---

[4] All citations to the PSR are to the copy provided to the Court by the U.S. Department of Probation. The PSR has not been filed on CM/ECF. The Court will cite to the PDF pagination, rather than to the internal PSR pagination, as not all page numbers in the PSR are numbered.

at 3:9–16.) He argued there was not enough evidence presented at trial for the jury to find Defendant guilty of conspiracy to distribute 500 or more grams of methamphetamine. (*Id.* at 3:9–5:15.) Specifically, Defendant contended that the only positive identifications at trial was the agent who identified Defendant at the Pic Quik station, and one identification via a telephone call. (*Id.* at 3:19–4:3.) Further, Defendant argued there was testimony at trial that Defendant was not aware of or involved in the Arizona transactions (in other words, he did not communicate with Christner's source of supply in Arizona, nor did he travel with Christner to the meet with Ms. Carillas). (*Id.* at 4:5–7.) Defendant argued he was merely a minor dealer who was involved in the trip to Anthony to secure drugs, which only produced smaller amounts. (*Id.* at 4:14–25.) Defendant argued that his minor role as a dealer who made a phone call and set up a meeting for Christner entitled him to a minor role adjustment, and the Guidelines range should be 51 to 63 months. (*Id.* at 5:8–14.)

Finally, Defendant argued that the jury instruction was written incorrectly, in that the amount is not an element of the offense. (*Id.* at 16:10–14.) To be correct, the instruction should not have included the amount in the elements of the offense; instead, the verdict form should have had a "yes" or "no" question related to the amount. (*Id.* at 16:12–14.) Because the Government conceded to taking away the "yes" or "no" question and acknowledged that it was necessary to convict Defendant of an A-level offense, then it would be incorrect to find now that the jury determined it was an A-level offense. (*Id.* at 16:17–17:12.)

The Government responded that Defendant mischaracterized the jury's determination. (*Id.* at 5:17–21.) The jury's note did not say it was unanimous in finding Defendant guilty of conspiracy but was not unanimous on the amount, it was simply asking for clarification because of the admitted inconsistency in the jury verdict form. (*Id.* at 5:21–6:22.) When the Court suggested that if the jury was unanimous as to guilt on Count 1 they could disregard the yes/no question,

Defendant's attorney pointed out that such a response did not completely answer the jury's question about whether 500 grams was an element of Count 1. (*Id.* at 6:23–7:11.) The Court then added the sentence in its response to the jury that 500 grams is an element of the offense. (*Id.* at 7:12–19.) This meant that a verdict of guilty on Count 1 had to include a unanimous finding that he was guilty of a conspiracy of 500 grams or more of methamphetamine. (*Id.* at 7:20–24.)

The Government argued there was sufficient evidence presented at trial to show that Defendant was involved in a conspiracy to distribute such a quantity. (*Id.* at 7:22–24.) While Defendant did not communicate with anyone in Arizona or drive with Christner to that particular exchange, there was evidence that Defendant was in contact with Christner before Christner traveled toward Arizona, as well as evidence that Christner collected money from Defendant and other dealers to make the purchase of three pounds of methamphetamine. (*Id.* at 7:25–8:16.) After Christner lost the Arizona source of supply, there is evidence that Defendant actively attempted to help establish a relationship with a new source of supply. (*Id.* at 9:12–11:17.) The Government asked the Court to overrule Defendant's objection on the amount of methamphetamine and the request that it be a C-level conspiracy, and find that the evidence supports a finding that the amount attributable is greater than what is encompassed by an offense level of 30.[5] (*Id.* at 12:3–19.) The Government further asked the Court to deny Defendant's request for a four-level reduction as a minimal participant. (*Id.* at 12:20–22.) The Government argued that as an ounce-level distributor who was elevated to the role of someone negotiating for a new pound-level source of supply, and who then returned to his role as ounce-level distributor, the zero level role assessment is accurate. (*Id.* at 13:4–21.)

---

[5] The Government further asked the Court to make a finding that the preponderance of the evidence clearly establishes that 500 grams and more of methamphetamine was involved in the conspiracy the jury convicted Defendant of, and "even if the 500 grams is eliminated from the jury's finding of guilt and that, instead, [Defendant] is guilty of a C-level methamphetamine conspiracy," the offense level remains at 30. (Sentencing Hr'g Tr. at 15:1–10.)

Finally, the Government responded to Defendant's argument that the Government conceded that taking away the yes or no question would waive the A-level finding. The Government asserted Ms. Davenport said that if the 500 grams was removed as an element, it would be a C-level conviction, but because that element was retained, and the jury found a specific weight as listed in Jury Instruction Number 13, the jury was asked to find guilt on an A-level conspiracy. (*Id.* at 17:18–18:12.)

## II.    Analysis of Defendant's Objection Related to Quantity

Defendant's first objection is to the assertion that he was convicted of 500 grams or more of methamphetamine. (Doc. 494 at 1.) Defendant's argument is two-fold: first, because the jury only wrote "Guilty" in response to question one on the verdict form and did not check "yes" in the follow-up question to question one, the jury necessarily did not find that the scope of the conspiracy was 500 grams and more of methamphetamine; and second, the Government's evidence at trial was insufficient to show a connection between Defendant and the Arizona deal. (*See* Docs. 494, 497.) The Court disagrees with both of these assertions.

### A.    The quantity of methamphetamine was an element of the conspiracy offense, and the jury unanimously agreed on the amount to find Defendant guilty.

"When drug quantity is used to enhance a sentence beyond the statutory maximum . . . , it must be charged in an indictment and proven to a jury beyond a reasonable doubt." *United States v. Wilson*, 244 F.3d 1208, 1215 (10th Cir. 2001), *as corrected on reh'g* (May 10, 2001). Here, the Government included the amount of methamphetamine (500 and more grams) as an element of the conspiracy charge in the indictment. (*See* Docs. 1 at 2, 484 at 14.) Quantity was also an element of the conspiracy count in the jury instructions. (Doc. 484 at 17.) The Court explained to the jury that in order to find the Defendant guilty of conspiracy in violation of 21 U.S.C. § 846, the jury

must be convinced that the government has proved each of the following beyond a reasonable doubt:

Number 1, two or more persons agreed to violate the federal drug laws;

Number 2, the defendant knew the essential objective of the conspiracy;

Number 3, the defendant knowingly and voluntarily involved himself in the conspiracy; and

Four, there was interdependence among the members of the conspiracy, that is, the members in some way or manner intended to act for their shared mutual benefit within the scope of the conspiracy charged; and

Finally, Number 5, the overall scope of the conspiracy involved at least 500 grams of a mixture and substance containing methamphetamine.

(Doc. 491 at 10:13–11:3.)

Question one on the jury verdict form required the jury to find Defendant guilty or not guilty "of Conspiracy as charged in Count 1 of the Indictment." (Doc. 487 at 1.) In its note to the Court during deliberations, the jury stated that it "read & [understood] that the amount of 500g or more is a criteria embedded in the Indictment in Count 1 (as part and parcel of the charge) . . . ." (*See* Doc. 485 at 5.) The jury was simply confused about the yes/no checkoff question immediately following question one and asked for clarity: "Can we agree on 'guilty for Count 1 and <u>not</u> agree that it involved more than 500 grams? Or do we have to mark 'YES' to the grams in order to find guilty [sic] on this charge?" (*Id.*)

The Court heard argument from counsel for both parties. Ms. Davenport was concerned that if the jury did not "answer the specific question about the amount, under *Apprendi*, then" the Defendant could not be sentenced to the mandatory minimums. (Doc. 493 at 92:15–23.) Mr. Harrison noted that the jury "framed it correctly, that the 500 grams is an element of the offense so they must find 500 grams to find him guilty. And that is an element in the jury instruction." (*Id.* at 88:23–89:2.) Ms. Davenport suggested that the Court rework the jury instructions: to advise the jury that the first question would not include an amount, and they would need to answer both questions. (*Id.* at 90:10–24.) Mr. Harrison said that "the clearer answer is that the 500 grams is an

14

element of the offense, and if you do not unanimously find 500 grams, you cannot find him guilty." (*Id.* at 91:14–20.)

The Court's response to the jury was consistent with the indictment and the jury instruction: if the jury "agree[d], unanimously, as to guilt on Count I," then the jury could "disregard the 'yes/no' question that follows." (Doc. 485 at 7.) The Court emphasized that "500 [grams] is an element of the offense." (*Id.*) The jury ultimately wrote "guilty" on the first part of question one and left the yes/no drop-down question blank. (Doc. 487 at 1.)

Defendant now argues that the jury's response on the verdict form is a clear sign that the jury "felt the defendant was guilty of conspiracy but not of the large quantity." (Doc. 497 at 2.) Outside of his argument related to sufficiency of the evidence, which the Court will address below, Defendant did not present any evidence or argument to support this contention.

Defendant also argued very briefly at the Sentencing Hearing that the jury instruction was incorrect: the quantity should not have been included among the elements of the conspiracy charge, and there should have been a separate yes/no question on the verdict form. (*See* Sentencing Hr'g Tr. at 16:10–14.) The Court finds that if there was any error in the jury instruction, it was harmless. Under *Apprendi*, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *United States v. Jones*, 235 F.3d 1231, 1236 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (internal quotation omitted)). Here, the quantity of methamphetamine—"500 grams or more of a mixture or substance containing a detectable amount of methamphetamine"— produced a statutorily prescribed sentencing range of "not less than 10 years or more than life[,]" 21 U.S.C. § 841(b)(1)(A)(viii), and a sentencing range of 121–151 months pursuant to the Guidelines, *see* U.S. Sentencing Guidelines Manual § 5G1.1(a). Quantity did not, therefore,

15

"increase[] the maximum penalty for" the conspiracy charge, even though it was "charged in [the] indictment, submitted to [the] jury, and proven beyond a reasonable doubt." *See Jones*, 235 F.3d at 1236 (quotations omitted).

Moreover, the Court cannot agree with Defendant's characterization of the jury's position. The jury's note indicated that the jury understood the quantity to be an element, and the jury had been instructed several times that it could not find Defendant guilty unless the Government had proven each element—including quantity—beyond a reasonable doubt. (*See, i.e.*, Docs. 491 at 6:22–25, 7:16–19, 9:10–14, 10:3–11:3 (listing the elements of the conspiracy charge on the first morning of trial and explaining to the jury that "[t]o find the defendant guilty of [conspiracy, it] must be convinced that the government has proved each" element "beyond a reasonable doubt"); 493 at 29:15–21, 37:21–40:3 (listing the elements of the conspiracy charge on the final day of trial and explaining the jury must find each element proved beyond a reasonable doubt); *see also* Doc. 485 at 7 (reminding the jury in the Court's response to the jury note that "500 [grams] is an element of the offense").)

The Supreme Court has noted that it "presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Defendant has not argued that the jury instructions or verdict form were unclear, he merely argues that the jury's verdict means something other than the plain language on the form. The Court declines to adopt this position and overrules any objection based on the verdict form or the instruction itself.

**B.** **The evidence was sufficient to show Defendant was part of a conspiracy involving 500 grams and more of methamphetamine.**

Defendant next argues that the Government failed to prove that Defendant was part of the conspiracy to purchase approximately three pounds of methamphetamine from the source of supply in Arizona. (Doc. 497 at 1.) Defendant contends the Government's evidence, at most, showed Defendant was involved in a smaller conspiracy regarding the methamphetamine purchased in Anthony. (*Id.* at 2.) The Court finds that the Government presented sufficient evidence to establish each element of the conspiracy charge.

**1.** **Two or more persons agreed to violate the federal drug laws.**

Defendant's primary contention related to this element is that there was insufficient evidence to show that he was part of the conspiracy to purchase three pounds of methamphetamine from the Arizona source of supply. Specifically, Defendant argued that "[t]he only identification of the defendant during the trial was that he was present at the [gas station] with Mr. Christner and they drove to Anthony where surveillance was lost." (Sentencing Hr'g Tr. at 3:21–24.) Defendant contends there was testimony presented at trial that "he was not aware of the Arizona transactions and was not involved in the Arizona transactions . . . ." (*Id.* at 4:5–7.)

The evidence presented at trial established that Defendant was a methamphetamine dealer under Christner. On March 16, 2013, DEA agents intercepted a telephone call between Christner and Defendant. (Doc. 491 at 63:12–65:23.) In this call, agents understood the two men were talking about the quality of methamphetamine Defendant was dealing for Christner. (*Id.* at 64:12–65:15.) Christner told Defendant that if he received complaints about the quality of the methamphetamine, Defendant could give refunds. (*Id.*) Christner also told Defendant that he would see his source of supply on Monday. (*Id.* at 65:14–23.)

On March 19, 2013, during the same timeframe that DEA agents were aware Christner was coordinating a trip to Arizona to pick up a new supply of methamphetamine, agents intercepted a telephone call in which Christner asked Defendant for money to help purchase a quantity of methamphetamine. (*See id.* at 67:16–68:2.) There is also evidence that Defendant and Christner met to exchange the money. (*Id.* at 69:19–70:15.) The next day, based on information they learned from the wire-tap investigation, DEA agents stopped two vehicles. The agents found over $16,000 in cash on Christner's person and seized approximately three pounds of methamphetamine from Ms. Casillas, the courier Christner had been communicating with in the days prior. (*Id.* at 66:25–67:15, 68:15–69:18, 71:9–80:17.)

Defendant noted during the trial that many of the calls the DEA agents intercepted during the investigation into this Arizona transaction did not involve Defendant. (*See id.* at 85:3–87:25.) He also pointed out that Defendant was not involved in the actual trip to Arizona to pick up the methamphetamine. (*Id.* at 88:5–14.)

While the Government did not present direct evidence that Defendant was involved in the negotiations for the methamphetamine from the Arizona source of supply, nor is there evidence he was present with either Christner or Ms. Casillas on the way to the transaction, there is sufficient evidence that at least Defendant and Christner conspired to violate federal drug laws. The evidence was sufficient to support an inference that Christner asked Defendant for money to purchase a quantity of methamphetamine, and Defendant agreed and gave him the money.

The Tenth Circuit has held that "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (quoting *United States v. Mendoza-Salgado*, 964 F.2d 993, 1005 (10th Cir. 1992) (internal quotation omitted)). While Defendant's role in the

Arizona transaction was merely that of a dealer contributing money to purchase a quantity of drugs, and there is no evidence he knew any of the other players in that transaction, the Court finds the evidence was sufficient to show that Defendant and Christner conspired to violate the law. This finding is bolstered by the fact that Defendant's role expanded when he attempted to establish a new relationship and negotiate pound-level purchases of methamphetamine from a new source of supply for Christner later in the conspiracy. (*See* Docs. 491 at 127:14–147:8; 492 at 5:24–21:1.)

### 2.    The defendant knew the essential objective of the conspiracy.

"A conspirator 'need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy,' but he or she must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator." *United States v. Evans*, 970 F.2d 663, 669–70 (10th Cir. 1992) (quoting *United States v. Metro. Enters.*, 728 F.2d 444, 451 (10th Cir. 1984) (internal citation omitted)). The Government presented evidence through two phone calls that Christner told Defendant that he would see his source of supply on Monday and later asked Defendant for money to purchase a quantity of methamphetamine. (Doc. 491 at 65:14–23, 68:1–2.) Not only is this evidence sufficient to support an inference that Defendant knew the essential objective of the conspiracy was to purchase methamphetamine, but that inference was further supported by the fact that Defendant later stepped up to help Christner establish a new source of supply in Anthony. (*See* Docs. 491 at 127:14–147:8; 492 at 5:24–21:1.)

### 3.    The defendant knowingly and voluntarily involved himself in the conspiracy.

The Government's evidence showed that the day after Christner asked Defendant for money to purchase methamphetamine, Defendant and Christner arranged to meet to exchange the money. (Doc. 491 at 69:19–70:15.) When the Arizona source of supply fell through and Christner needed new product, Defendant helped by attempting to negotiate a pound-level purchase from a

new source of supply in Anthony. (*See* Docs. 491 at 127:14–147:8; 492 at 5:24–21:1.) The Court

finds the Government's evidence was sufficient to show that Defendant knowingly and voluntarily

involved himself in the conspiracy—from the Arizona transaction through the negotiations with

his contact in Anthony.

### 4. There was interdependence among the members of the conspiracy.

The Tenth Circuit has held that "[i]nterdependence is present when 'each alleged

coconspirator . . . depend[s] on the operation of each link in the chain to achieve the common

goal.'" *Evans*, 970 F.2d at 670 (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)

(internal citation omitted)). "In essence, the defendant's actions must 'facilitate[ ] the endeavors

of other alleged coconspirators or facilitate[ ] the venture as a whole.'" *Id.* (quoting *United States*

*v. Horn*, 946 F.2d 738, 740–41 (10th Cir. 1991); citing *Fox*, 902 F.2d at 1515 ("interdependence

present and conspiracy conviction proper where a 'scheme for distributing cocaine for profit in

Denver depended for its success on the successful achievement of several integrated steps,

including regular meetings between [the defendants], the pooling of their resources to purchase

drugs, and . . . several wholesale cocaine purchases'"); *United States v. McIntyre*, 836 F.2d 467,

472 (10th Cir. 1987) ("interdependence not present and conspiracy conviction improper where the

defendant was a buyer in several unrelated transactions and '[t]he Government [did] not show[ ]

that if defendant had failed to possess and distribute drugs on any one of the named occasions, the

failure would have had any effect on the success of the other transactions.'")). Here, the

Government presented evidence sufficient to infer that Christner depended on Defendant's

contribution to buy a larger quantity of drugs, and Defendant depended on Christner to make the

transaction so that Defendant could deal the drugs to supplement his own income. Defendant's

actions both in dealing drugs to individuals and in contributing money to purchase large quantities

of methamphetamine "facilitate[d] the venture as a whole." *See Evans*, 970 F.2d at 670 (quotation and citations omitted). Later, Defendant's role in attempting to help find a new source of supply and negotiating for pound-level purchases for Christner also helped facilitate the endeavors of the conspiracy. *See id.*

The Tenth Circuit has also emphasized two "kinds of evidence in evaluating a sufficiency of the evidence challenge to a drug conspiracy conviction." *Small*, 423 F.3d at 1183.

> First, evidence establishing that a defendant purchased drugs on multiple occasions and for the purpose of resale, as opposed to a one-time purchase for personal use, is an indication that the defendant was aware of and shared common goals with the larger conspiracy. *See Evans*, 970 F.2d at 673. As [the Tenth Circuit] has noted, "[w]here large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979). Second, evidence showing that the defendant attended meetings or was privy to information regarding the scope of the criminal conspiracy is also relevant for the same reasons. *Evans*, 970 F.2d at 673.

*Id.*

Here, the Government's evidence showed that Defendant was an established and trusted dealer who regularly purchased methamphetamine from Christner for the purpose of resale. Second, through the telephone calls in which Christner told Defendant he would see his source of supply on Monday and later asked Defendant for money to purchase a quantity of methamphetamine, the Government provided evidence sufficient to infer that Defendant was privy to information regarding the scope of the conspiracy to buy a large quantity of methamphetamine from the Arizona source of supply in March 2013. This second finding is reinforced by Defendant's later actions in attempting to facilitate a new source of supply relationship for Christner. The Court finds the Government's evidence was sufficient to prove that Defendant and Christner "act[ed] together for their shared mutual benefit within the scope of the conspiracy

21

charged." *See United States v. Summers*, 430 F. App'x 658, 661 (10th Cir. 2011) (quoting *United States v. Caldwell,* 589 F.3d 1323, 1329 (10th Cir. 2009) (internal quotation omitted)).

### 5.    The overall scope of the conspiracy involved more than 500 grams of a mixture and substance containing methamphetamine.

Defendant's main argument is that the Government did not present evidence sufficient to tie him to the Arizona transaction and the three pounds of methamphetamine. (*See* Doc. 497.) As the Court's foregoing analysis demonstrates, however, the Government's evidence is sufficient to show that Defendant and Christner acted interdependently in the conspiracy to obtain methamphetamine from Christner's Arizona source of supply in March 2013, a quantity that was approximately three pounds, or more than 500 grams, and later to obtain methamphetamine from a new source of supply in Anthony that Defendant helped facilitate. The Court will overrule Defendant's objection based on insufficient evidence.

## III.    Analysis of Defendant's Objection Related to Role Adjustment

Defendant did not specifically challenge the amount of methamphetamine attributed to him at sentencing, choosing instead to focus on his arguments regarding sufficiency of the evidence at trial and whether he was entitled to a mitigating role adjustment. The Court will overrule Defendant's objection to the role assessment and finds that the calculation of methamphetamine attributable to Defendant in the PSR was correct.

### A.    Defendant's sentencing is correctly based on 500 grams and more of methamphetamine.

The PSR attributed 500 to 1,500 grams of a mixture containing methamphetamine to Defendant. (*See* PSR at 38.) This is consistent both with the evidence adduced at trial—which demonstrated Defendant's participation in the conspiracy to obtain approximately three pounds of methamphetamine from Christner's Arizona source of supply in March 2013, and approximately

four ounces from the Anthony source of supply in April 2013—as well as with the jury's verdict, which was specifically premised on a finding that Defendant was involved in a conspiracy involving 500 and more grams of methamphetamine. Pursuant to U.S. Sentencing Guidelines Manual § 2D1.1(a)(3), Defendant's base offense level was 30. (*See id.* at 39.) Combined with a criminal history category III, his advisory Guidelines range was 121 months to 151 months as to Counts 1 and 13, and 48 months as to Counts 23, 30, 36, and 41. (*Id.* at 51.)

"In calculating an appropriate sentence, the Guidelines consider a defendant's 'offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.'" *United States v. Roybal*, 188 F. Supp. 3d 1163, 1201 (D.N.M. 2016) (quoting U.S. Sentencing Guidelines Manual § 1B1.1, cmt. 1(H)). Courts are to sentence based on a defendant's "real conduct . . . to effectuate Congress' purpose in enacting the guidelines." *Id.* (discussing *United States v. Booker*, 543 U.S. 220, 250–51) (2005)).

> Section 1B1.3(a) provides that the base offense level under the guidelines "shall be determined" based on the following:
> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
> (4) any other information specified in the applicable guideline.

*Id.* at 1201–02 (quoting U.S. Sentencing Guidelines Manual §1B1.3(a)(1)–(4)). The Court is to use a preponderance of the evidence standard when determining such relevant conduct. *See id.*

(citing *United States v. Vigil*, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007); *United States v. Schmidt*, 353 F. App'x 132, 135 (10th Cir. 2009) ("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard . . .") (internal citation omitted)).

The Court adopts the PSR's factual findings and makes the following particularized findings about the scope of Defendant's jointly undertaken criminal activity and the quantity of methamphetamine attributable to Defendant. "The weight of drugs attributable to [Defendant] 'is not necessarily based on the overall amount involved in the conspiracy for which he was convicted or on the transactions in which he personally participated.'" *United States v. Green*, 537 F. App'x 806, 808 (10th Cir. 2013) (quoting *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1265 (10th Cir. 2013)). "Instead, he is responsible for drugs: (1) that are within the scope of criminal activity he agreed to undertake, and (2) that are reasonably foreseeable in connection to the criminal activity." *Id.* (citing *Figueroa-Labrada*, 720 F.3d at 1265 (construing U.S. Sentencing Guidelines Manual § 1B1.3 n. 2 (2010))). "Under the illustrations to the Federal Sentencing Guidelines, a drug dealer who pools his resources and profits with other drug dealers is accountable for the other dealers' sales because they are 'in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.'" *Id.* (quoting U.S. Sentencing Guidelines Manual § 1B1.3 illus. (C)(6) (2010)).

The quantity of methamphetamine both the PSR and the Court attribute to Defendant primarily encompasses the approximately three pounds seized by law enforcement in March 2013. While there is evidence that Defendant started as an ounce-level dealer under Christner, the evidence shows that Defendant pooled his money with Christner for the purpose of buying a large quantity of methamphetamine from his Arizona source of supply. Defendant was aware that any

amount he did not personally sell from the quantity of methamphetamine would be sold by other dealers. Hence, as in *Green*, the entire amount of methamphetamine was reasonably foreseeable to Defendant as part of his buy-in to the joint drug-selling venture. *See* 537 F. App'x at 808. That Defendant later attempted to negotiate pound purchases of methamphetamine from a new source of supply he knew in Anthony is even further proof that Defendant was aware of the scope of criminal activity he agreed to undertake throughout the conspiracy. The Court finds that 500 to 1,500 grams (which includes both the amount seized in Arizona as well as the amount Christner purchased from the source of supply Defendant facilitated in Anthony) was both "reasonably foreseeable" to Defendant and "within the scope of his jointly undertaken criminal activity with" Christner. *See id.*

      **B.**    **Defendant is not entitled to a minor role adjustment.**

The Court finds that Defendant is not entitled to a mitigating role adjustment. "The Tenth Circuit has held that the inquiry whether a defendant is a minor or minimal participant must 'focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense.'" *Roybal*, 188 F. Supp. 3d at 1215 (quoting *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1277 (10th Cir. 2004) (internal quotation omitted)). "To receive the adjustment, the defendant has 'the burden to prove by a preponderance of the evidence' that he was 'less culpable than most other participants.'" *Id.* (quoting *United States v. Ballard*, 16 F.3d 1110, 1114–15 (10th Cir. 1994) (internal citations omitted)).

Defendant contended that because "[t]he government repeatedly referred to the defendant as a minor player and an ounce dealer" at trial, he should be afforded an adjustment for a minor role. (Doc. 494 at 2.) Defendant asked the Court to find the offense level was "26 or less based on

quantity with minus 4 for minimal participant . . . ." (*Id.*) The Government disagreed and argued that "[a] four-level minimal role reduction is meant to be applied to the least culpable members of an organization." (Doc. 500 at 11 (citing U.S. Sentencing Guidelines Manual § 3B1.2, n.4 (explaining that the minimal role adjustment "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.").) The Government argued that while Defendant "was an ounce-level dealer at the beginning of the wiretap investigation, [he] subsequently rose to the task of negotiating for pounds of methamphetamine from a new source of supply for Christner, and then returned to his role as an ounce-level dealer." (*Id.* at 11–12.)

The Court agrees with the Government. A minor role participant "plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S. Sentencing Guidelines Manual § 3B1.2 cmt. (3)(A). Defendant did much more than simply deal drugs at ounce levels. He pooled money to buy larger quantities of drugs with the knowledge that the drugs would be resold for a profit. Later, he facilitated the introduction between Christner and a new potential source of supply and helped negotiate pound-level purchase prices. Defendant failed to demonstrate that his conduct was "substantially less culpable than the average participant in the criminal activity." *See id.*

## IV.    Conclusion

The Court hereby overrules Defendant's objections to the PSR. The sentence imposed on February 15, 2017 stands.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Objection to the Pre-Sentence Report (Doc. 494) and Addendum to Joint Motion to Continue Trial and Attendant Deadlines (Doc. 497) are **DENIED**.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**